# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| SONJA HOSKEY,<br><br>  Plaintiff,<br><br>vs.<br><br>JO ANNE B. BARNHART,<br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>  Defendant. | No. C04-0110<br><br>**ORDER** |

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits. On November 9, 2004, the parties consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (docket number 4). The court finds for the defendant and the matter is dismissed.

## PROCEDURAL BACKGROUND

Plaintiff Sonja Hoskey applied for Title II Social Security benefits on August 1, 2002, alleging an inability to work since September 27, 2000, due to suffering from major depressive disorder, post-traumatic stress disorder, and cognitive difficulties. Her application was originally denied and was denied on reconsideration. A hearing before Administrative Law Judge (ALJ) Jean M. Ingrassia was held on October 16, 2003. In an opinion dated February 19, 2004, the ALJ denied benefits. On June 30, 2004, the Appeals Council denied Plaintiff's request for review.

1

## FACTUAL BACKGROUND

Sonja Hoskey was born on February 13, 1946, and was 54 at the time of the alleged disability onset date. (Tr. 42). Ms. Hoskey has a high school education and attended three months of secretarial vocational training. (Tr. 411) She has past relevant work experience as a youth service worker, community educator, realtor, and teacher's aide. (Tr. 155).

In 1990, Ms. Hoskey witnessed her sister being killed by the sister's estranged husband, even though there was a police officer at the scene. (Tr. 420). After this event, Ms. Hoskey, in 1992, sought treatment for depression and received such treatment, for major depressive disorder, from Dr. Jerry Lewis consistently from 1992 until 2000. (Tr. 208-219). During these years, Ms. Hoskey continued to work as a youth service worker at the Iowa Juvenile Home in Toledo, Iowa. (Tr. 155, 421).

Ms. Hoskey was still working at the Iowa Juvenile Home in April of 2000. (Tr. 155). One day, while at work, Ms. Hoskey was violently attacked by a female resident of the home. (Tr. 421). The resident hit Ms. Hoskey with a chair and then began to choke her until the resident was restrained. (Tr. 421). Ms. Hoskey was taken to the hospital, treated, and released the same day. (Tr. 421-22). After the incident, Ms. Hoskey returned to work. (Tr. 422). She also visited Dr. Lewis on May 8 and he continued to diagnose her with major depressive disorder but stated that she was doing "really quite well." (Tr. 295).

On August 22, 2000, Ms. Hoskey went to see Pamela Tekippe, a licensed independent social worker (LISW), at the Mental Health Clinic of Tama County. (Tr. 270). Ms. Hoskey was seeking individual therapy as a result of the attack she suffered in April and recent news stories about the attack. (Tr. 270). Ms. Tekippe noted that Ms. Hoskey showed symptoms of post-traumatic stress disorder (PTSD), including anxiety while at work. (Tr. 270). Ms. Hoskey also stated that she suffered from diminished memory. (Tr. 270). However, her daily functioning, including going to work,

2

was good and she displayed no perceptual difficulties. (Tr. 270). Ms. Tekippe assessed Ms. Hoskey with a Global Assessment of Functioning (GAF) score of 50. (Tr. 271). Ms. Hoskey visited Ms. Tekippe one more time to discuss possible therapy on September 1, 2000. (Tr. 274).

In September of 2000, Ms. Hoskey was still working at the Iowa Juvenile Home. (Tr. 422). She visited Dr. Lewis on September 11 and he said that she was "doing well," that her major depressive disorder was in partial remission, and gave her a GAF of 80. (Tr. 294). Later in the month, charges had been filed against the girl who had attacked her and Ms. Hoskey had to give a deposition in the case. (Tr. 422). Her attacker was present at this deposition and sat across the table from Ms. Hoskey. (Tr. 422). Though there was a police officer in the room, Ms. Hoskey was afraid that the girl would be able to attack her again and she became distressed. (Tr. 422). Ms. Hoskey later tried to return to work at the Iowa Juvenile Home but, when she tried to go to the Home, she suffered panic attacks, shortness of breath, and fear. (Tr. 422). She has not been able to return to the Home since September of 2000. (Tr. 423).

On October 2, 2000, Ms. Hoskey returned to see Dr. Lewis. (Tr. 291). In his report of the visit, Dr. Lewis noted that Ms. Hoskey has suffered from a lot of anxiety since the attack and especially since the deposition. (Tr. 291). She appeared quite anxious during the visit. (Tr. 291). She stated that she has recollections of being hit by the chair. (Tr. 291). Ms. Hoskey had been taking Xanax, as prescribed by her family doctor, Amitriptyline, Prozac, and Trazodone. (Tr. 291). Dr. Lewis diagnosed her with major depressive disorder and post-traumatic stress disorder, which had just started. (Tr. 291). He gave her a GAF of about 59. (Tr. 291). Dr. Lewis increased her Prozac dosage and granted her medical leave from work. (Tr. 292). He encouraged her to continue visiting Ms. Tekippe for therapy, which Ms. Hoskey did not do until 2003, and advised her that one way to get over her anxiety would be flooding, which is going to the place she is very anxious and stay there until the anxiety is gone. (Tr. 292).

3

Ms. Hoskey next visited Dr. Lewis on October 23, 2000. (Tr. 289). She reported having both good days and bad days, but that she was no longer visualizing being hit by the chair as often and that many of the symptoms of PTSD had improved. (Tr. 289). However, she was still anxious, though the anxiety comes and goes, and felt that she could not go back to the Iowa Juvenile Home. (Tr. 289). Dr. Lewis gave her a GAF of about 60. (Tr. 289). He added Buspar, a drug used to manage anxiety, to the medication she was taking. (Tr. 290).

Ms. Hoskey returned to Dr. Lewis twice more during 2000. (Tr. 284, 286). On November 6, he noted that she was "somewhat better," no longer had visions of being attacked, but that her anxiety about returning to the scene of the attack remained. (Tr. 287). Her GAF was about 62. (Tr. 287). On December 4, Ms. Hoskey told Dr. Lewis that she had been more depressed for the last week and that her anxiety and worry were still present. (Tr. 284). He gave her a GAF of about 60. (Tr. 284). He also stated that he did not think she would be able to go back to work because of her situation. (Tr. 285).

Ms. Hoskey continued to visit Dr. Lewis throughout 2001 and into 2002. (Tr. 276, 280, 282, 307, 308, 312, 321, 324, 327). His assessment of her condition did not change significantly during this time as he consistently gave her a GAF of between 50 and 59 and diagnosed her with PTSD. (Tr. 280, 327). On April 27, 2001, Dr. Lewis wrote a letter describing Ms. Hoskey's condition. (Tr. 278-79). He said that Ms. Hoskey had feelings of severe anxiety and distress when she thought about going to work. (Tr. 278). He noted that developing PTSD two to three months after the stressful event was fairly typical. (Tr. 279). Dr. Lewis opined that Ms. Hoskey would never be able to return to work at the Iowa Juvenile Home but that "it remains to be seen" if she would be able to return to any kind of work. (Tr. 279).

On May 2, 2001, Ms. Hoskey visited Dr. James Gallagher, who performed a psychiatric evaluation of her. (Tr. 301). In a letter, Dr. Gallagher noted that Ms. Hoskey was anxious and distrusted the environment at the Iowa Juvenile Home, which is why she could not return to work there. (Tr. 302). He stated that she had difficulty with her memory, due to her anxiety, and that she also had trouble concentrating. (Tr. 303). Therefore, she had a hard time thinking about returning to work because she did not want to appear to be incompetent when working. (Tr. 303-04). She was not having nightmares. (Tr. 304). Dr. Gallagher did not see evidence of any disorder of thought or perceptual abnormalities. (Tr. 304). He noted that she became anxious during the interview, but that this anxiety seemed manageable and that she was not incapacitated by her anxious and depressive symptoms. (Tr. 304). Ms. Hoskey completed two psychological tests. (Tr. 304). One returned a result that was "probably valid," though there was some suggestion of symptom exaggeration, and showed that she was in psychological distress. (Tr. 304). The second test also showed psychological distress but Dr. Gallagher noted that it was interesting that the test did not list PTSD as a possible diagnostic consideration. (Tr. 304-05). However, Dr. Gallagher agreed with Dr. Lewis's diagnosis of PTSD, noted that Ms. Hoskey was improving and that she was thinking about returning to work, just not at the Juvenile Home. (Tr. 305).

After a visit with Ms. Hoskey on July 9, 2001, Dr. Lewis noted that someone had found two or three jobs for Ms. Hoskey, but that she had been advised, by her workers compensation lawyer, not to return to work until Dr. Lewis cleared her to return. (Tr. 307). At this session, Ms. Hoskey stated that her biggest problem was with her memory; however, Dr. Lewis noted that she was able to describe in great detail the things she could not remember. (Tr. 307). Dr. Lewis concluded that the memory issue was due to anxiety and depression, not "true brain dysfunction." (Tr. 307). He wanted her to undergo neuropsychological testing to determine if this was indeed the case. (Tr. 307).

On November 6, 2001, Ms. Hoskey visited Dr. Gallagher again. (Tr. 315). He noted that she "tends to become rather anxious and frightened when she is outside her 'comfort zone.'" (Tr. 315). Ms. Hoskey appeared to be much the same as when she previously visited Dr. Gallagher. (Tr. 316). She was very withdrawn and passive. (Tr. 315). There was no evidence of gross thought disorder or obvious cognitive disorganization, though she did have impaired concentration that may be causing memory problems. (Tr. 317). She seemed frightened of the notion of returning to work. (Tr. 317). Dr. Gallagher confirmed his opinion that Ms. Hoskey had PTSD, that persistent anxiety and fearfulness are her major problems, and she is convinced she would fail if she tried to return to working. (Tr. 317). However, her depressive symptoms, as distinct from her anxiety, were "fairly mild" and would not intrude on her ability to work. (Tr. 317). He concluded that Ms. Hoskey's memory and concentration problems were significant, though the source of these problems was not clear. (Tr. 317). Dr. Gallagher felt that neuropsychological testing would help determine the source of her problems and that this testing would help determine if she had a primary memory problem. (Tr. 317). After this testing, Dr. Gallagher expected that Ms. Hoskey should be able to make some effort to work. (Tr. 314). Until then, however, he felt that she could not return to work without treatment and encouragement. (Tr. 318).

Ms. Hoskey underwent a neuropsychological assessment on December 19, 2001, at the University of Iowa. (Tr. 319-20). The assessment was done by Dr. John Bayless. (Tr. 320). Ms. Hoskey scored in the average range on intelligence tests, her reading skills were average, and her fund of knowledge, verbal reasoning, attention span, and calculations were normal. (Tr. 320). Her nonverbal abilities were variable. (Tr. 320). Her memory performance revealed nonverbal deficits and she had impairments in short-term recall for designs and delayed recognition memory for the complex figure. (Tr. 320). However, all measures of verbal memory were intact and her verbal intellectual and

6

memory functioning were normal. (Tr. 320). Her personality profile was consistent with depressive symptoms. (Tr. 320).

Dr. Lewis reviewed the results of the neuropsychological assessment with Ms. Hoskey on January 16, 2002. (Tr. 321). He noted that the assessment showed that she had a suspected right temporal lobe dysfunction with some trouble with visual types of memory, but that verbal memory was fine. (Tr. 321). Other than this, her testing was within normal limits. (Tr. 321). Dr. Lewis, as he had in the past, suggested that Ms. Hoskey pursue psychotherapy, but indicated that she had not done so and seemed to be putting it off. (Tr. 321).

In a letter dated March 28, 2002, Dr. Lewis expressed his opinion that Ms. Hoskey's ability to be employed was very low. (Tr. 323). He stated that this was because of the combination of the neuropsychological findings that she had nonverbal memory deficits and "her severe anxiety depressive symptoms." (Tr. 323). He also stated that her memory deficits were consistent with her complaints of memory problems over the prior two years. (Tr. 323). According to Dr. Lewis, Ms. Hoskey is "unemployable and will continue to be so indefinitely." (Tr. 325).

On November 11, 2002, Michael Luttrell, a licensed psychologist, performed a psychological evaluation on Ms. Hoskey. (Tr. 345-47). He found that her concentration was adequate but that there was the possibility of some short-term memory difficulties. (Tr. 346). Her judgment seemed adequate but she appeared tentative and uncertain. (Tr. 346). He concluded that he thought Ms. Hoskey would have some difficulty retaining some instructions, procedures and locations due to her short-term memory and possible concentration problems. (Tr. 347). However, he thought she could interact well with others. (Tr. 347). Mr. Luttrell determined that she met the criteria for PTSD but, though she shows some signs of depression, she did not warrant a major depressive diagnosis. (Tr. 346). He placed her GAF at 60. (Tr. 347). He recommended that she continue to get help for her PTSD symptoms. (Tr. 347).

7

On December 4, 2002, Dr. John Tedesco completed a consultative assessment and summary on Ms. Hoskey. (348-53). He determined that most of her understanding, memory, concentration, social interaction, and adaptation skills were not significantly limited. (Tr. 348-49). Ms. Hoskey's ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to interact appropriately, to accept instructions and criticism, and to travel in unfamiliar places were moderately limited. (Tr. 348-49).

In his summary, Dr. Tedesco concluded that, in regards to Ms. Hoskey's cognitive disorder, her intelligence and memory functioning is normal. (Tr. 352). Her cognitive deficits were only mild and, by themselves, not indicative of marked impairments. (Tr. 352). Her depression was under control and, by itself, not indicative of marked impairments. (Tr. 352). Though her PTSD appeared to make it difficult for her to leave the house, she had done so on a regular basis and her PTSD symptoms do not result in marked functional limitations. (Tr. 352). Dr. Tedesco also noted a number of inconsistencies that detract from her claim of being unable to work. (Tr. 352). Those inconsistencies include: questions about Ms. Hoskey's motivation, the fact that she had not undergone psychotherapy since August 2000, and the fact that Ms. Hoskey indicates that she is not able to go outside the house but her daily activities include shopping by herself, driving, and socializing. (Tr. 352-53). Dr. Tedesco concluded that the data suggested that Ms. Hoskey "will have some moderate limitations in her abilities to remember and understand complex instructions, particularly instructions or tasks that are primarily nonverbal in nature." (Tr. 353). She does, however, "have the capacity to remember and understand simple instructions." (Tr. 353). Ms. Hoskey would also be impaired in her ability to interact "with a large group of people whom she does not know," but has no problems interacting with a few people or with those she knows. (Tr. 353). Finally, Dr. Tedesco noted that the treating source opinion was not given controlling weight in

formulating his assessment because it was inconsistent with other evidence, including the GAF scores, that are indicative of moderate impairments. (Tr. 353).

Ms. Hoskey returned to Ms. Tekippe to begin psychotherapy on April 22, 2003. (Tr. 381). Ms. Hoskey wanted therapy to try and improve her memory. (Tr. 381-82). She continued with this therapy for five more sessions. (Tr. 376-80). She continued to improve throughout the sessions. (Tr. 376).

From May 21 until September 9, Ms. Hoskey was seen three times by a psychiatrist, Dr. Laura VanCleve. (Tr. 372-75). At the May 21 visit, Dr. VanCleve rated Ms. Hoskey at a 60 GAF and noticed that her concentration was clearly impaired. (Tr. 375). Dr. VanCleve indicated that Ms. Hoskey would continue therapy with Ms. Tekippe. (Tr. 375). The other two visits were for Dr. VanCleve to review Ms. Hoskey's medication and make some adjustments. (Tr. 372-73).

Both Dr. VanCleve and Ms. Tekippe filled out a medical assessment of Ms. Hoskey's ability to work. (Tr. 390-398). These assessments were made by each assessor determining what percentage of the time during an eight hour workday Ms. Hoskey would be able to satisfactorily perform certain tasks, such as following work rules and using judgment. (Tr. 390-91). Dr. VanCleve rated Ms. Hoskey's abilities near the bottom of the ranges. (Tr. 390-91). Ms. Tekippe assessed how Ms. Hoskey would perform on both a good day and a bad day, noting that her good days were about 25% of the time. (Tr. 394-95).

At her hearing before the ALJ, Ms. Hoskey testified that she suffers from PTSD. (Tr. 413). She described the symptoms of PTSD as including shortness of breath, getting really scared, being afraid she may be attacked again, not wanting to leave the house, trouble driving, trouble concentrating, and memory problems. (Tr. 422-23, 425). She testified that she does leave the house to do shopping and to socialize, though she feels more comfortable going with people she knows than by herself. (Tr. 433). She testified

9

that she is afraid that, if she gets a job, she would not be able to handle it and would get fired. (Tr. 435, 439).

## **CONCLUSIONS OF LAW**

### Scope of Review

In order for the court to affirm the Administrative Law Judge's (ALJ) findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989). Substantial evidence is more than a mere scintilla. It means relevant evidence a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Taylor v. Bowen, 805 F.2d 329, 331 (8th Cir. 1986). The court must take into account evidence which fairly detracts from the ALJ's findings. Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Cruse, 867 F.2d at 1184 (quoting Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

### ALJ's Determination of Disability

Determining whether a claimant is disabled is evaluated by a five-step process. See 20 C.F.R. § 404.1520(a)-(f); Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

> The five steps are:
> (1) If the claimant is engaged in substantial gainful activity, disability benefits are denied.
> (2) If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of

> impairments, is medically severe. If the impairment is not severe, benefits are denied.
> (3) If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.
> (4) If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.
> (5) If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990) (citing Bowen v. Yuckert, 482 U.S. at 140-42); 20 C.F.R. § 404.1520(a)-(f)).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (citing Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. Id.

Under the first step of the above analysis, the ALJ determined that the plaintiff had not engaged in substantial gainful employment since September 2000. At the second step, the ALJ determined the plaintiff had the following severe impairments: post-traumatic stress disorder and major depressive disorder. At the third step, the ALJ determined that the Plaintiff's impairments were not equivalent to one of the listed impairments. At the

fourth step, the ALJ determined that the plaintiff had the following residual functional capacity (RFC):

> [T]o perform the exertional and nonexertional requirements of work, with the following exceptions: the claimant retains the residual functional capacity to perform the mental and physical requirements of work except for only mild limitations of her ability to function independently, effectively and appropriately on a consistent basis in a competitive job market. She generally functions pretty well in relationships.

The ALJ determined that, based on this RFC, the plaintiff is able to perform her past relevant work as a community educator. Therefore, the ALJ determined that the plaintiff was not under a disability.

## Opinion of Treating Physician

Ms. Hoskey argues that the ALJ failed to properly weigh the medical evidence in the case. Specifically, she argues that the ALJ improperly disregarded the opinions of Ms. Hoskey's treating physicians, Dr. Lewis, Dr. VanCleve, and Ms. Tekippe. "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted). The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. See 20 C.F.R. § 404.1527(d)(2). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).

Ms. Hoskey argues that the ALJ failed to properly consider the medical evidence from her treating physicians and that the RFC given by the ALJ was not based upon medical evidence. However, there is substantial evidence to support the ALJ's decision.

The treating physicians' opinions are not well-supported by the evidence. Ms. Hoskey's neuropsychological testing reveals that she suffers from little memory deficits and no verbal memory deficit at all. The other substantial evidence in the record shows that Ms. Hoskey is able to function reasonably well, including doing shopping on her own, socializing, and leaving her home to visit doctors and family. Other evidence shows that Ms. Hoskey frequently talked about finding a new job, which also supports the finding that she was not disabled. See Barret v. Shalala, 52 F.3d 784, 786 (8th Cir. 1994) (claimant's statements that he was seeking employment were inconsistent with disability). Ms. Hoskey also failed to seek psychotherapy, even though her physicians recommended that she do so numerous times, thereby discrediting her claim of disability.

Ms. Hoskey argues that the ALJ improperly placed little weight on assessment forms filled out by Dr. VanCleve and Ms. Tekippe, purporting to rate Ms. Hoskey's ability to function during a normal workday. However, these forms are not supported by any medical evidence. Dr. VanCleve and Ms. Tekippe do not explain the basis for their opinions nor is there any diagnostic evidence in the record that would explain these opinions. In fact, the opinions seem to be in contradiction with the results of the neuropsychological testing Ms. Hoskey underwent. Furthermore, the opinions are not supported by treatment notes prepared by Ms. Hoskey's physicians, which indicate that Ms. Hoskey's condition was improving and that her ability to function was increasing. Finally, these reports were not filled out until the fall of 2003 and are not evidence of Ms. Hoskey's condition during 2000, 2001, and 2002, when neither of the therapists were seeing her regularly.

Upon the foregoing,

IT IS ORDERED that the court finds in favor of the defendant and this matter is dismissed.

May 4, 2005.

                                                          _____
                                                          JOHN A. JARVEY
                                                          Magistrate Judge
                                                          UNITED STATES DISTRICT COURT